UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TENISHA FULFORD,

                *Plaintiff,*

    – against –

NEW YORK CITY TRANSIT AUTHORITY,
PEDRO MOCTEZUMA, LEONARD
YOUNG, SHEA NOTEMAN, JESLY
JACOB, REZA KHAN,

                *Defendants.*

**MEMORANDUM & ORDER**
23-cv-08279 (NCM) (JAM)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Tenisha Fulford was previously employed by defendant New York City Transit Authority ("NYCTA") as a conductor. Defs' 56.1 ¶¶ 1, 108; Pl's 56.1 Counter ¶¶ 1, 108.[1] She brings suit against NYCTA and several of its employees, raising claims of discrimination on the basis of her race, sex, and sexual orientation, as well as claims of retaliation, negligence, assault, and battery. Compl. ¶ 1. Before the Court is defendants' motion for summary judgment on all counts. Mot. 9.[2] For the reasons stated below, defendants' motion is **GRANTED** in part and **DENIED** in part.

---

[1]    The Court refers to plaintiffs' Complaint, ECF No. 1, as the "Complaint"; defendants' Memorandum of Law in Support of their Motion for Summary Judgment, ECF No. 60, as the "Motion"; plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ECF No. 62, as the "Opposition"; defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, ECF No. 64, as the "Reply"; defendants' Rule 56.1 Statement, ECF No. 60-1, as "Defendants' 56.1"; and plaintiff's Response to Defendants' Rule 56.1 Statement, ECF No. 62-1, as "Plaintiffs' 56.1 Counter."

[2]    Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

**BACKGROUND**

Plaintiff is a Black bisexual woman. Massimi Decl. Ex. 11 ("Fulford Tr.") 306:13–14, ECF No. 62-13. Plaintiff began her employment with the NYCTA on January 9, 2023 as a conductor on a probationary basis. Defs' 56.1 ¶ 1; Pl's 56.1 Counter ¶ 1. She was required to comply with various workplace rules while on duty, including that she not use a cell phone. Defs' 56.1 ¶ 5; Pl's 56.1 Counter ¶ 5.

A.    Events of February 20, 2023

On February 20, 2023, plaintiff finished her shift and entered the dispatcher's office at the Canarsie terminal. Defs' 56.1 ¶ 7; Pl's 56.1 Counter ¶ 7. Defendant Pedro Moctezuma, a Train Dispatcher, was on duty at the time. Defs' 56.1 ¶ 8; Pl's 56.1 Counter ¶ 8. Plaintiff requested that Moctezuma sign her overtime slip. Defs' 56.1 ¶ 12; Pl's 56.1 Counter ¶ 12. Moctezuma responded by stating that he would sign plaintiff's overtime slip "at a later time" (in defendants' telling) or "whenever he's ready" (in plaintiff's telling). Defs' 56.1 ¶ 13; Pl's 56.1 Counter ¶ 13.[3] Plaintiff told Moctezuma that she was instructed in her conductor training to have her overtime slip signed by the dispatcher at the end of her shift. Defs' 56.1 ¶ 14; Pl's 56.1 Counter ¶ 14.[4] Moctezuma was dismissive during the

---

[3]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

[4]    Defendants' Rule 56.1 Statement, in paragraph 14, states "*Plaintiff asserts that* she told Dispatcher Moctezuma she was instructed in her conductor training to have her overtime slip signed by the Dispatcher at the end of her shift. (Hurd Decl., Ex. 1, Plaintiff Tr. 70:10-16.)." Defs' 56.1 ¶ 14. Because defendants have directed the Court's attention to evidence in the record supporting the proposition that plaintiff told this to Moctezuma, because defendants have not directed the Court to any evidence in the record that would controvert this proposition, and because plaintiff considers this proposition undisputed, Pl's 56.1 Counter ¶ 14, the Court assumes the proposition itself to be an undisputed fact for purposes of the instant motion. The Court applies the same reasoning to each instance where defendants use similar language in their Rule 56.1 statement. *See also* Mot. 19 ("For purposes of this motion, [d]efendants assume arguendo that [p]laintiff's allegations regarding . . . Moctezuma's statements are truthful.").

discussion and at one point "snatched" plaintiff's overtime slip from her. Defs' 56.1 ¶ 16; Pl's 56.1 Counter ¶ 16. Moctezuma also spoke to plaintiff aggressively and "was creating this hostile work environment versus if he was to talk to a male employee." Defs' 56.1 ¶ 17; Pl's 56.1 Counter ¶ 17. During this encounter, Moctezuma acted "standoffish" as if he did not want to sign the overtime slip. Defs' 56.1 ¶ 23; Pl's 56.1 Counter ¶ 23. He also "smashed" the overtime slip and threw it on the table. Defs' 56.1 ¶ 23; Pl's 56.1 Counter ¶ 23. Moctezuma was "condescending," "very aggressive," and "very rude" and spoke in a "very mean way, very dominant way." Defs' 56.1 ¶ 23; Pl's 56.1 Counter ¶ 23. Upon exiting the dispatcher's office, plaintiff stated "Excuse me sir. That was extremely rude," to which Moctezuma responded "Listen, this is how we do it over here." Defs' 56.1 ¶ 23; Pl's 56.1 Counter ¶ 23.

B.    Events of March 14, 2023

On March 14, 2023, plaintiff again worked as a conductor at the Canarsie terminal. Defs' 56.1 ¶ 26; Pl's 56.1 Counter ¶ 26. When plaintiff operated her train, the Train Operator Display ("TOD") appeared to be offline and had been tagged by the NYCTA's maintenance team as defective. Defs' 56.1 ¶ 27; Pl's 56.1 Counter ¶ 27. The TOD is a device that makes automatic announcements of train stops. Defs' 56.1 ¶ 28; Pl's 56.1 Counter ¶ 28. According to defendants, if a TOD malfunctions, the conductor "should not attempt to reprogram the TOD, *unless* directed to do so by the train operator." Defs' 56.1 ¶ 28 (emphasis in original). Plaintiff disputes this and instead asserts that if a TOD malfunctions, the conductor may reprogram it. Pl's 56.1 Counter ¶ 28.

Dispatcher Shelia Fenderberg requested that plaintiff and the assigned train operator on plaintiff's train report to the dispatcher's office following their trip because plaintiff's train was delayed when leaving and arriving to the terminal. Defs' 56.1 ¶ 29; Pl's

3

56.1 Counter ¶ 29. When plaintiff went to the dispatcher's office as instructed, Fenderberg was not present but Moctezuma was. Defs' 56.1 ¶¶ 30–32; Pl's 56.1 Counter ¶¶ 30–32. Moctezuma and plaintiff then engaged in an exchange of words regarding TOD procedures and the departure of plaintiff's train. Defs' 56.1 ¶ 33; Pl's 56.1 Counter ¶ 33. The parties provide differing accounts of what was said between Moctezuma and plaintiff, but the parties appear to agree that topics mentioned during the exchange include: why the train was late, whether plaintiff had followed proper procedures related to the TOD, the hypothetical possibility of taking a photo of the malfunctioning TOD, and a prohibition on employees using cell phones while performing their duties. Defs' 56.1 ¶¶ 33–39; Pl's 56.1 Counter ¶¶ 33–39. During this exchange, Moctezuma questioned plaintiff's knowledge of the NYCTA and stated "are you dumb?" Defs' 56.1 ¶ 40; Pl's 56.1 Counter ¶ 40. Assistant Train Dispatcher Monique Blackwood-Smith was present for this exchange. Defs' 56.1 ¶¶ 30, 41; Pl's 56.1 Counter ¶¶ 30, 41.

The parties also disagree about how the exchange ended. Defendants state that "[a]t the conclusion of the discussion, Dispatcher Moctezuma notified [p]laintiff that she was being sent home." Defs' 56.1 ¶ 42. Plaintiff disputes this assertion on the basis that plaintiff did not testify that the exchange was a "mere discussion" or that "it ended in this manner." Pl's 56.1 Counter ¶ 42. According to plaintiff, she did not feel comfortable with Moctezuma so she left his office, and when she turned around to leave, "Moctezuma threatened to have her removed from service, followed [her] out the door, slammed the door behind her, and continued screaming down the stairs at [her]." Pl's 56.1 Counter ¶ 42. Plaintiff maintains that "Moctezuma stated to [her] that he could make one phone call to have her removed from service because he did not like her attitude." Pl's 56.1 Counter ¶ 42. Plaintiff also maintains that Moctezuma "removed [her] from service[] and gave her shift to a male

4

employee so that he could get overtime." Pl's 56.1 Counter ¶ 42. Furthermore, plaintiff maintains that at some point on March 14, 2023, she told Moctezuma that she wanted to make a complaint against him and also requested to file a complaint with NYCTA Superintendent Brian McManamon. Pl's 56.1 Counter ¶ 42; *see also* Pl's 56.1 Counter ¶ 56.

Sometime afterwards, plaintiff left the dispatcher's office and proceeded to her next scheduled train. Defs' 56.1 ¶ 43; Pl's 56.1 Counter ¶ 43. When plaintiff was at the train and preparing to depart, another conductor named Jason Ertischelc appeared and spoke to her. Defs' 56.1 ¶ 44; Pl's 56.1 Counter ¶ 44. Defendants maintain that he informed plaintiff that she was being sent home and he was taking over her scheduled shift. Defs' 56.1 ¶ 44. Plaintiff asserts that Ertischelc entered the train cab and stated "my boy just gave me this job," that plaintiff asked who Ertischelc was referring to, and that Ertischelc responded "Oh, Moctezuma. That's my boy. I'm about to get this overtime." Pl's 56.1 Counter ¶ 44.

Plaintiff heard Moctezuma instruct her over the radio to return to the dispatcher's office. Defs' 56.1 ¶ 46; Pl's 56.1 Counter ¶ 46. Train Service Supervisor Carolann Grenald heard about plaintiff's interaction with Ertischelc and Moctezuma via radio transmission and proceeded to the platform to assist. Defs' 56.1 ¶ 47; Pl's 56.1 Counter ¶ 47. Grenald informed plaintiff that plaintiff was to leave the train and report back to the dispatcher's office and that plaintiff was being sent home. Defs' 56.1 ¶ 48; Pl's 56.1 Counter ¶ 48. Grenald then escorted plaintiff to the dispatcher's office to discuss with Moctezuma the reason that plaintiff was being sent home. Defs' 56.1 ¶ 49; Pl's 56.1 Counter ¶ 49. Moctezuma stated he did not like plaintiff's "attitude" and that plaintiff was being sent home. Defs' 56.1 ¶ 50; Pl's 56.1 Counter ¶ 50. When Grenald inquired about the reason that Moctezuma sent plaintiff home, Moctezuma said that plaintiff had a "nasty attitude that day" and had walked away from him. Defs' 56.1 ¶ 50; Pl's 56.1 Counter ¶ 50.

5

During plaintiff's encounters with Moctezuma on March 14, 2023, Moctezuma did all of the following: (1) asked plaintiff "Are you dumb?"; (2) stated "You're loud" and "I don't like you[r] attitude"; (3) stated "I don't like you!"; (4) referred to plaintiff as a "girl" with an "attitude." Defs' 56.1 ¶ 51; Pl's 56.1 Counter ¶ 51.[5] Additionally, during plaintiff's discussions with Moctezuma, he "either implied or stated . . . that [p]laintiff was being 'loud and ghetto.'" Defs' 56.1 ¶ 53; Pl's 56.1 Counter ¶ 53.

Plaintiff subsequently left the dispatcher's office and went to the superintendent's office to speak with Superintendent Brian McManamon. Defs' 56.1 ¶ 55; Pl's 56.1 Counter ¶ 55. The parties agree that plaintiff and McManamon had a verbal exchange, during which plaintiff alleged that Moctezuma yelled at her, screamed at her, insulted her by calling her dumb and loud, and told her that she had an attitude. Defs' 56.1 ¶¶ 56–57; Pl's 56.1 Counter ¶¶ 56–57. Plaintiff asserts that she "complained about . . . Moctezuma, and McManamon disregarded her complaints." Pl's 56.1 Counter ¶ 56. Plaintiff further asserts, in addition to the statements that the parties agree she said, that she also told McManamon that Moctezuma was "verbally assaulting her, . . . being rude, nasty, hostile[,] and sending her home from no reason." Pl's 56.1 Counter ¶ 56. Plaintiff claims that "McManamon refused to take [plaintiff]'s complaint and instead responded by expressing disbelief," telling plaintiff that "such behavior was uncharacteristic of . . . Moctezuma" and that "I don't know what to do. I don't get involved in things like this." Pl's 56.1 Counter ¶ 56. Plaintiff alleges that she was "then instructed to return to the dispatcher's office to speak to . . . Moctezuma

---

[5]     In some instances, the only evidence cited by the parties for factual assertions is the complaint itself. *See, e.g.*, Defs' 56.1 ¶ 51; Pl's 56.1 Counter ¶ 51. Generally, "an unverified complaint is not evidence that can be relied upon at summary judgment." *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023). However, because both plaintiff and defendants mutually designate these assertions as undisputed, the Court treats them as established for purposes of the instant motion.

again, which [she] did" and that "[d]uring this conversation, . . . Moctezuma stated that he did not like [her] attitude." Pl's 56.1 Counter ¶ 56.

At some point on March 14, 2023, McManamon instructed Moctezuma, Grenald, Blackwood-Smith, and Ertischelc to complete and submit to him incident reports, known as "G-2 statements," regarding their interactions with plaintiff on that day. Defs' 56.1 ¶ 61; Pl's 56.1 Counter ¶ 61. McManamon collected those G-2 statements and drafted a memorandum. Defs' 56.1 ¶ 61; Pl's 56.1 Counter ¶ 61. Plaintiff further asserts that "McManamon told . . . Moctezuma to write a statement regarding the March incident with [plaintiff] because [plaintiff] had repeated incidents with . . . Moctezuma" and that "Moctezuma wrote his G2 report after McManamon told him that [plaintiff] was claiming she had repeated incidents with [him]." Pl's 56.1 Counter ¶ 61.

The memorandum that McManamon prepared stated that: (1) after plaintiff entered his office, plaintiff alleged that Moctezuma had yelled at her; and (2) as McManamon was saying out loud that that behavior was uncharacteristic of Moctezuma, plaintiff turned around and walked out of McManamon's office while he was still talking, mid-sentence. Defs' 56.1 ¶ 62; Pl's 56.1 Counter ¶ 62. Plaintiff does not dispute that this is what the memorandum says, but does dispute that these events are what in fact occurred. Pl's 56.1 Counter ¶ 62.

C.    Plaintiff's Restriction to Platform Duties and Subsequent Events

On March 15, 2023, McManamon sent his memorandum along with the G-2 statements of Moctezuma, Grenald, Blackwood-Smith, and Ertischelc to Senior Director of Operations Training Leonard Young (one of the defendants named in this action), as well as Superintendent of Service Delivery Operations Training Cicily Nierer and Superintendent of Operations Training Sanya Hill. Defs' 56.1 ¶ 63; Pl's 56.1 Counter ¶ 63.

7

On March 16, 2023, Nierer forwarded McManamon's memorandum along with the attached G-2 statements to Young, as well as Train Service Supervisor Shea Noteman and Assistant Transit Management Analyst Jesly Jacob (two additional defendants named in this action). Defs' 56.1 ¶ 64; Pl's 56.1 Counter ¶ 64. In Nierer's e-mail, Nierer recommended that plaintiff be restricted to performing platform duties, pending review by the NYCTA Probationary Unit. Defs' 56.1 ¶ 64; Pl's 56.1 Counter ¶ 64. At the time, the Probationary Unit—comprised of Young, Noteman, Jacob, and Train Service Supervisor Reza Khan (an additional named defendant)—processed all disciplinary issues with respect to probationary employees. Defs' 56.1 ¶¶ 66–67; Pl's 56.1 Counter ¶¶ 66–67. On March 20, 2023, Jacob sent an e-mail to the NYCTA B Division Crew Office requesting that plaintiff be restricted to performing platform duties. Defs' 56.1 ¶ 65; Pl's 56.1 Counter ¶ 65. Jacob's request was processed by the Crew Office the same day. Defs' 56.1 ¶ 65; Pl's 56.1 Counter ¶ 65.

Between March 21, 2023 and March 28, 2023, Young sent McManamon's memorandum along with the attached G-2 statements to several NYCTA managers and asked the managers to provide a recommendation on whether to extend plaintiff's period of probation or to terminate plaintiff's probationary employment. Defs' 56.1 ¶ 71; Pl's 56.1 Counter ¶ 71. On March 24, 2023, Noteman emailed Young asking how the Probationary Unit should further proceed. Defs' 56.1 ¶ 70; Pl's 56.1 Counter ¶ 70. On April 4, 2023, Young also sent the same documentation to Chief Officer of Service Delivery Tony Abdallah and requested he review the documentation for a final decision. Defs' 56.1 ¶ 72; Pl's 56.1 Counter ¶ 72.

8

On April 11, 2023, plaintiff filed a complaint regarding her interactions with Moctezuma with the NYCTA Equal Employment Office. Defs' 56.1 ¶ 73; Pl's 56.1 Counter ¶ 73.

### D.   Events of April 16, 2023

On April 16, 2023, plaintiff was performing platform duties at a station. Defs' 56.1 ¶ 80; Pl's 56.1 Counter ¶ 80. According to defendants, while plaintiff was performing her platform duties, "she had a physical encounter with an inebriated passenger." Defs' 56.1 ¶ 81. According to plaintiff, she "was sexually assaulted." Pl's 56.1 Counter ¶ 81. Plaintiff informed Train Service Supervisor Gamit Jaswal that a male passenger had sexually assaulted her. Defs' 56.1 ¶¶ 81–82; Pl's 56.1 Counter ¶¶ 81–82. According to defendants, Jaswal "asked [p]laintiff whether she wanted to go home as a result of the encounter" and "[p]laintiff notified . . . Jaswal that she did not want to go home." Defs' 56.1 ¶ 82. According to plaintiff, "Jaswal repeatedly interrupted [her] to question and reprimand her for what she was wearing" and plaintiff thereafter "complained to two other NYCTA employees and stated that Jaswal had not taken her complaint of sexual assault." Pl's 56.1 Counter ¶ 82. Jaswal subsequently reported plaintiff's allegations to NYCTA Operations Control Center and police officers arrived to take plaintiff's statement. Defs' 56.1 ¶ 83; Pl's 56.1 Counter ¶ 83. Plaintiff then spoke with Assistant Train Dispatcher Crystal Page, who asked plaintiff to complete a G-2 statement regarding her encounter with the inebriated passenger. Defs' 56.1 ¶ 84; Pl's 56.1 Counter ¶ 84. Plaintiff, Jaswal, and Page each completed G-2 statements regarding what happened. Defs' 56.1 ¶¶ 84–85; Pl's 56.1 Counter ¶¶ 84–85.

### E.   Plaintiff's Reassignment to the Probationary Unit and Termination

On April 20, 2023, General Superintendent of Transportation Operations Glenroy Walcott sent Noteman an e-mail with his recommendation that NYCTA terminate

plaintiff's employment. Defs' 56.1 ¶ 75; Pl's 56.1 Counter ¶ 75. On April 21, 2023, plaintiff submitted her own G-2 statements regarding her February 20, March 14, and April 16 incidents to Nierer, who forwarded these statements to members of the Probationary Unit, including Noteman, Jacob, and Khan. Defs' 56.1 ¶¶ 76–78; Pl's 56.1 Counter ¶¶ 76–78.

On April 24, 2023, Noteman sent an e-mail to the Crew Office requesting that plaintiff begin reporting to the Probationary Unit's office at 130 Livingston Street instead of the platform. Defs' 56.1 ¶ 89; Pl's 56.1 Counter ¶ 89. Defendants assert that this measure was directed by Director of Operations Policies and Procedures Lonnie Fields because of plaintiff's encounter with the passenger on April 16, 2023. Defs' 56.1 ¶¶ 79, 89.

On May 1, 2023, plaintiff reported to the Probationary Unit and had a discussion with Noteman regarding why she was required to report there. Defs' 56.1 ¶¶ 91–92; Pl's 56.1 Counter ¶¶ 91–92. Defendants assert that "Noteman explained that as a result of [the] incident with an inebriated passenger, [Fields] requested that [p]laintiff report to the Probationary Unit instead of the platform until the NYCTA issued a final decision about [p]laintiffs' disciplinary action stemming from the March 14, 2023 incident." Defs' 56.1 ¶ 93. Plaintiff asserts that when she "arrived at the probationary unit, . . . Noteman informed [her] of these reasons she was there: that the [d]efendants were watching her, they remembered her, and they received her complaints about . . . Moctezuma." Pl's 56.1 Counter ¶ 89. Plaintiff also asserts that "Noteman told [p]laintiff that they needed to watch her because she had complained of sexual assault." Pl's 56.1 Counter ¶ 93.

Plaintiff subsequently requested to speak with Noteman's manager. Defs' 56.1 ¶ 97; Pl's 56.1 Counter ¶ 97. Shortly thereafter, plaintiff met with Young, Khan, Noteman, Jacob, and a union representative. Defs' 56.1 ¶ 98; Pl's 56.1 Counter ¶ 98. Plaintiff spoke about her February 20 and March 14 interactions with Moctezuma and her encounter with a

passenger on April 16. Defs' 56.1 ¶ 99; Pl's 56.1 Counter ¶ 99. After this meeting, Young instructed Noteman to draft a termination memorandum that reflected the managers' prior recommendations that plaintiff be terminated. Defs' 56.1 ¶ 100; Pl's 56.1 Counter ¶ 100. Noteman drafted the termination memorandum. Defs' 56.1 ¶ 101; Pl's 56.1 Counter ¶ 101. Defendants allege that Noteman did so based on "statements . . . which included G-2 statements from all the involved parties, including the [p]laintiff," Defs' 56.1 ¶ 101, while plaintiff alleges that "Noteman testified that she intentionally omitted information from [plaintiff's own G-2] and drafted the memo [to include] only allegations made against [plaintiff], omitting [plaintiff's] claims of discrimination, retaliation, and sexual assault." Pl's 56.1 Counter ¶ 101.

Noteman then provided the memorandum to Young, who reviewed it along with the statements. Defs' 56.1 ¶ 103; Pl's 56.1 Counter ¶ 103. Young initialed the memorandum and then provided the document and supporting documentation to Chief Officer of Operations Monica DaCosta. Defs' 56.1 ¶ 105; Pl's 56.1 Counter ¶ 105. Defendants assert that DaCosta "provided the final approval for [p]laintiff's termination of employment," Defs' 56.1 ¶ 105, while plaintiff asserts that "DaCosta did nothing more than 'sign off' on this decision which had already been made," Pl's 56.1 Counter ¶ 105.

On May 3, 2023, plaintiff was asked to attend a meeting with Young, Khan, and Jacob, during which Young informed plaintiff that her employment was being terminated. Defs' 56.1 ¶ 108; Pl's 56.1 Counter ¶ 108.

F.    The Instant Lawsuit

On November 7, 2023, plaintiff filed the instant lawsuit against NYCTA and five of its employees in their individual and official capacities: Moctezuma, Young, Noteman, Jacob, and Khan (collectively, the "Individual Defendants"). Compl. ¶¶ 15–20. The

11

complaint raised thirteen claims: (1-2) Title VII discrimination and retaliation against NYCTA; (3) Section 1983 against the Individual Defendants; (4) New York City Human Rights Law ("NYCHRL") discrimination against all defendants; (5) NYCHRL aiding and abetting discrimination against the Individual Defendants; (6) NYCHRL retaliation against all defendants; (7) NYCHRL vicarious liability against NYCTA; (8-9) New York State Human Rights Law ("NYSHRL") sex and gender discrimination and retaliation against all defendants; (10) NYSHRL aiding and abetting discrimination against the Individual Defendants; (11) negligence against all defendants; (12) "respondeat superior" against NYCTA; and (13) assault and battery against the individual defendants. Compl. ¶¶ 118–88. Defendants now move for summary judgment on all counts, *see* Mot., which plaintiff opposes, *see* Opp'n.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021). Facts are in genuine dispute when "the jury could reasonably find for" the non-moving party based on the evidence in the record. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir 2021).

The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). Where the moving party

meets their burden, the non-moving party must provide sufficient evidence establishing a genuine issue of material fact beyond "[t]he mere existence of a scintilla of evidence." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012). "A district court may not make credibility determinations, or weigh evidence" on summary judgment. *Reynolds v. Quiros*, 990 F.3d 286, 294 (2d Cir. 2021). Thus, a district court denies summary judgment where there are disputed facts "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## DISCUSSION

I.    Title VII Claim for Race, Gender, and Sexual Orientation Discrimination

Plaintiff's first cause of action alleges that defendant NYCTA engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by discriminating against plaintiff on the basis of her gender, race, and sexual orientation. Compl. ¶¶ 118–21. Plaintiff does not argue that she has direct evidence of discrimination, but rather, evidence that is circumstantial.

The Supreme Court has established a three-step burden-shifting framework for a plaintiff seeking to prove employment discrimination via circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). On a motion for summary judgment, a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022).

13

Plaintiff's "burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998).

If plaintiff makes such a showing, the court adopts "a temporary presumption of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). To rebut the presumption, the employer must present "admissible evidence of a legitimate nondiscriminatory reason for its adverse employment decision." *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000). The reason must be "legitimate," "nondiscriminatory," "clear," and "specific." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 132 (2d Cir. 2012).

If the employer presents such a reason, the burden shifts back to the plaintiff to show that the proffered reasons amount to a pretext for unlawful discrimination. *See Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024). However, "while a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the employer's proffered reason." *Id.* (emphasis in original). Rather, a plaintiff can prevail at the third step "by proving that an impermissible factor was a *motivating factor*, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Id.* (emphasis in original); *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."). This is "often referred to as a 'mixed motive' case." *Radwan v. Manuel,* 55 F.4th 101, 130 (2d Cir. 2022).

14

A.    Plaintiff's Prima Facie Case of Discrimination

Plaintiff must establish four elements to demonstrate a *prima facie* case of employment discrimination. Of these four elements, defendants do not dispute the first three—that plaintiff was a member of a protected class (on the basis of her race, sex, and sexual orientation), that plaintiff was qualified for her job, and that plaintiff was subject to one or more adverse employment actions. The parties disagree whether the "adverse action occurred under circumstances giving rise to an inference of discrimination." *Alvarado*, 631 F. Supp. 3d at 111.

"[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009). Where there is no direct evidence of discrimination, a plaintiff may rely on indirect or circumstantial evidence. *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Indeed "smoking gun" or "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69, 76 (2d Cir. 2001).

Key circumstantial evidence of racial discrimination that plaintiff identifies is her deposition testimony that, on March 14, 2023, her supervisor Moctezuma referred to her as "loud and ghetto." *See* Opp'n 25; Defs' 56.1 ¶ 53; Pl's 56.1 Counter ¶ 53. This characterization arose out of a series of interactions between Moctezuma and plaintiff where plaintiff alleges that Moctezuma berated plaintiff's performance, "yelling at her,

15

insulting her, verbally assaulting her, calling her dumb, loud, claiming she had an attitude[,] being rude, nasty, hostile and sending her home." Pl's 56.1 Counter ¶ 151; *see also* Defs' 56.1 ¶¶ 51–57; Pl's 56.1 Counter ¶¶ 51–57. The Court finds that Moctezuma's reference to plaintiff as "loud and ghetto" constitutes exactly the sort of "criticism of the plaintiff's performance in ethnically degrading terms" from which Second Circuit has held "an inference of discriminatory intent may be derived." *Leibowitz*, 584 F.3d at 502. Many courts have recognized the blatant racism entailed in calling a Black individual "ghetto." *See, e.g.*, *Williams v. Camden USA, Inc.*, No. 19-cv-00691, 2021 WL 6066115, at *6 (S.D. Cal. Feb. 19, 2021) ("[U]se of the word ghetto is highly indicative of discriminatory animus."); *Williamson v. Denk & Roche Builders, Inc.*, No. 04-cv-04051, 2006 WL 1987808, at *3 (N.D. Ill. July 11, 2006) ("[Plaintiff] undoubtedly was subjected to an offensive racist comment by [superintendent] when [superintendent] said that [plaintiff] lived near the 'ghetto.'"); *Daniel v. ABM Indus., Inc.*, No. 16-cv-01300, 2017 WL 1216594, at *10 (S.D.N.Y. Mar. 31, 2017) (holding that description of employees as "ghetto" constituted "language with racial overtones"); *Garza v. Ranier L.L.C.*, No. 1:12-cv-00475, 2013 WL 3967786, at *3–5 (W.D. Tex. July 31, 2013) (holding that termination of employee on the basis of employee's office's "ghetto-ness" constituted evidence of discrimination sufficient to deny defendant's motion for summary judgment). The Court finds that this evidence is sufficient basis to make an inference of discriminatory intent.

Defendants argue that the Court should not credit the evidence in the record supporting the proposition that Moctezuma called plaintiff loud and ghetto because plaintiff "has been inconsistent throughout her various versions of what had occurred." Mot. 15–16 n.5. Defendants assert that: (1) plaintiff's complaint "makes the hearsay representation that Dispatcher Moctezuma told a third party that she was too loud and

ghetto"; (2) plaintiff's written incident report to the NYCTA says that "Dispatcher Moctezuma *implied* that I was being loud and ghetto"; and (3) plaintiff's deposition testimony "initially stated that Dispatcher Moctezuma implied she was loud and ghetto, by stating she was talking too loud, and then later state[d] that a union representative told her that Dispatcher Moctezuma was implying that she was loud and ghetto[,] and then later state[d] that Dispatcher Moctezuma called her loud and ghetto and called her a girl in front of her peers." Mot. 15–16 n.5 (emphasis in defendants' motion). To be sure, factual questions remain with respect to the "loud and ghetto" remark, such as the exact circumstances of when and to whom it was said, and whether Moctezuma "called" plaintiff the characterization or only "implied" that plaintiff was the characterization. The Court nevertheless concludes without difficulty that evidence in the record supports the proposition that Moctezuma characterized plaintiff as "loud and ghetto," and no matter the precise context in which that characterization was made, it suffices to give rise to "an inference of discriminatory intent." *Leibowitz*, 584 F.3d at 502.

The Court notes, furthermore, that Moctezuma referring to plaintiff as a "girl" could also be construed by a reasonable juror as evidence of race discrimination. *See* Defs' 56.1 ¶ 51; Pl's 56.1 Counter ¶ 51; *see also* Fulford Tr. 255:1, 305:12–18. The U.S. Supreme Court has recognized that calling a Black man "boy" can be evidence of racism. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that referring to African-American employees as "boy" could, depending on context, constitute "evidence of discriminatory animus"); *see also Bell v. Korkis*, No. 19-cv-13565, 2024 WL 69807, at *3 n.1 (E.D. Mich. Jan. 5, 2024) ("It is well understood that the word 'boy' is a long-standing racial slur traditionally used by white people to demean and belittle adult black men."); *Hernandez v. Commc'ns Unlimited of the S., Inc.*, No. 03-cv-00760, 2005 WL 3803064, at *6

17

(M.D. Ala. Feb. 22, 2005). Similarly, calling a Black woman "girl" could reasonably be understood by a juror to similarly diminish and reinforce harmful racial stereotypes, thus constituting evidence of racism. *See, e.g., Overton v. Se. Penn. Transp. Auth.*, No. 20-cv-06027, 2022 WL 1084744, at *4 (E.D. Pa. Apr. 11, 2022) ("To be sure, calling a black woman a 'girl' can have racial undertones. . . . Depending on the context, inflection, tone of voice, local custom, and historical usage, the term 'girl' might be evidence of racial animus."). This further bolsters plaintiff's argument that she has identified sufficient evidence on which to base an inference of discriminatory intent.

Because Moctezuma was not the decisionmaker behind plaintiff's termination or other potential adverse employment actions, the Court must also address the issue of causation. As a general principle, "[a]ctions by an individual not involved in the adverse employment decision at issue do not give rise to an inference of discrimination." *Chang v. Safe Horizon*, No. 03-cv-10100, 2005 WL 2125660, at *7 (S.D.N.Y. Sept. 1, 2005). However, "the element of causation can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the actual decisionmaker, even if the latter did not consciously discriminate against the plaintiff." *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 515 n.10 (E.D.N.Y. 2018) (quoting *Sadki v. SUNY Coll. at Brockport*, 310 F.Supp.2d 506, 513 (W.D.N.Y. 2004)). In the present case, plaintiff alleges that Moctezuma stated to plaintiff "I am going to get you fired! I don't like you!" Defs' 56.1 ¶ 64; Pl's 56.1 Counter ¶ 64. Moreover, Moctezuma composed a statement regarding plaintiff that was relied upon by the decisionmakers who decided to restrict plaintiff to platform duty and to terminate her employment. *See, e.g.*, Defs' 56.1 ¶¶ 64, 100; Pl's 56.1 Counter ¶¶ 64, 100. The Court thus finds it plausible that Moctezuma influenced the relevant decisionmakers. Accordingly, because it is plausible to believe that

18

Moctezuma acted with discriminatory intent and plausible to believe that Moctezuma influenced the relevant decisionmakers, plaintiff has satisfied her burden to establish a prima facie case of racial discrimination.

The evidence of sex discrimination that plaintiff cites is her deposition testimony that Moctezuma referred to plaintiff as "girl" during her employment, on top of characterizing her as "loud and ghetto" and "dumb," and saying that she had a "nasty attitude." *See* Defs' 56.1 ¶¶ 51, 53; Pl's 56.1 Counter ¶¶ 51, 53; Fulford Tr. 255:1; 305:12–18. The Court finds that this is sufficient to infer discriminatory intent on the basis of plaintiff's status as a woman. To be sure, a male supervisor calling a female employee "girl," without anything more, might not suffice to prove a case of sex-based discrimination. *See, e.g., Picardi v. Pulmonary Consultants, Inc.*, No. 24-cv-01440, 2025 WL 1462548, at \*12 (E.D. Pa. May 21, 2025). However, Moctezuma's pattern of comments about plaintiff—referring to her as "girl," calling her "loud" and "dumb," and accusing her of having a "nasty attitude"—constitute repeated sexist tropes. Looking at these comments together, a reasonable jury could conclude that Moctezuma acted with discriminatory intent against plaintiff because of her status as a woman. Accordingly, plaintiff has satisfied her burden to establish a prima facie case of sex discrimination.

Finally, with respect to discrimination on the basis of sexual orientation, plaintiff's opposition to defendants' summary judgment motion abandons this theory of discrimination. Plaintiff's memorandum of law makes no substantive mention of sexual orientation whatsoever. *See generally* Opp'n. The parties' Rule 56.1 statements make only a single reference to sexual orientation, mutually agreeing that Moctezuma was not aware of plaintiff's sexual orientation at the time of the February 2023 encounter. Defs' 56.1 ¶ 24; Pl's 56.1 Counter ¶ 24. Accordingly, plaintiff has not satisfied her burden to establish a

prima facie case of discrimination on the basis of her sexual orientation. Defendant is thus entitled to summary judgment on the Title VII claim to the extent it relies on a theory of discrimination on the basis of sexual orientation.

> B. Defendants' Purported Non-Discriminatory Reason for Plaintiff's Adverse Employment Actions

Given that plaintiff has presented a prima facie case of race and sex discrimination, the Court adopts "a temporary presumption of discriminatory motivation." *Littlejohn*, 795 F.3d at 307. To rebut the presumption, defendant must offer "admissible evidence of a legitimate nondiscriminatory reason for [the] adverse employment decision." *Howley*, 217 F.3d at 150. This is a burden of production, not persuasion, on the defendant's part, and it "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Defendants argue that the "legitimate, non-discriminatory reason for [plaintiff's] termination" was "her violation of multiple NYCTA rules, regulations, policies, and bulletins on March 14, 2023." Mot. 19. Specifically, defendants allege that she was terminated for five issues: (1) "fail[ing] to adhere to NYCTA policies and procedures while operating her train;" (2) "attempt[ing] to show pictures she took on her cellular device to Dispatcher Moctezuma in order to demonstrate the technical difficulties she confronted, despite NYCTA policies and procedures expressly prohibiting the use of a cellular device while an employee is performing their duties;" (3) "disregard[ing] Dispatcher Moctezuma's attempts at reinstruction[,] walk[ing] out of his office mid-conversation, and ignor[ing] his direction that she was being sent home;" (4) "delay[ing] a train from leaving the station, us[ing] her phone to record the conductor who was instructed to replace her on that train, and yell[ing] profane language at the conductor;" and (5) "walk[ing] out of

20

the superintendent's office while he was mid-sentence." Mot. 19–20 (citing *See* Defs' 56.1 ¶¶ 104–05.). These reasons were stated in the May 1, 2023 termination memorandum. *See* Defs' 56.1 ¶ 104; Pl's 56.1 Counter ¶ 104 (disputing the memorandum's accuracy but not its contents). The Court finds that defendants have satisfied their burden to offer a legitimate nondiscriminatory reason for making an adverse employment decision. Defendants have cited evidence in the record of reasons that—if true and not pretextual— would constitute a legitimate basis for plaintiff's termination. *See, e.g., Cunningham v. Consol. Edison Inc.,* No. 03-cv-03522, 2006 WL 842914, at \*20 (E.D.N.Y. Mar. 28, 2006) (finding poor work performance, violation of supervisor instructions, and use of profanity constituted a legitimate, non-discriminatory reason for termination); *Sullivan v. N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (finding insubordination and use of profanity constituted a legitimate, non-discriminatory reason for termination). The Court thus moves to the third stage of the inquiry.

      C.      <u>Plaintiff's Rebuttal Regarding the Reason for Plaintiff's Termination</u>

Given that defendants have offered a nondiscriminatory purported reason for plaintiff's termination, the burden shifts back to plaintiff to either show that the proffered reason was pretextual or that discrimination was a motivating factor. *Bart*, 96 F.4th at 570. Under the pretext route, plaintiff's rebuttal will preclude summary judgment if plaintiff shows that there is a genuine dispute of material fact as to whether the proffered reason was pretextual. *See, e.g., Osekavage v. Sam's E., Inc.*, 619 F. Supp. 3d 379, 393 (S.D.N.Y. 2022); *Villar v. City of New York*, 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015). Pretext may be shown "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). Meanwhile, under the

21

motivating factor route, plaintiff can meet her burden by "showing that even if the employer's reason [for the adverse action] is true, discrimination was still a motivating factor in the employment decision." *Bart*, 96 F.4th at 573–74.

The Court concludes that NYCTA is not entitled to summary judgment because there remain genuine issues of material fact as to whether defendants' proffered reasons for plaintiff's termination are true or pretextual. Notably, defendants cite evidence in the record to show that all five instances of plaintiff's alleged misconduct occurred, and plaintiff cites different evidence in the record that the five instances either did not happen or happened differently than defendants allege.

First, defendants allege that plaintiff "fail[ed] to adhere to NYCTA policies and procedures while operating her train." Defs' 56.1 ¶ 104. In response, plaintiffs cite deposition testimony that "[w]hen [plaintiff] returned to the terminal, Defendant Moctezuma explained to [plaintiff] that NYCTA standard operating procedure requires conductors to switch to manual train stop announcements in the event of a TOD malfunction . . . because attempts at fixing the TOD can result in unnecessary delay." Pl's 56.1 Counter ¶ 104. Plaintiff insists that she in fact "had followed this protocol and had switched to manual announcements." Pl's 56.1 Counter ¶ 104 (citing Fulford Tr. 148:10–20). There is thus a material factual dispute over whether plaintiff actually failed to follow policies or not.

Second, defendants allege that plaintiff "attempt[ed] to show pictures she took on her cellular device to Dispatcher Moctezuma in order to demonstrate the technical difficulties she confronted." Defs' 56.1 ¶ 104. In response, plaintiff cites deposition testimony that plaintiff in fact "inform[ed] Defendant Moctezuma that her train was late because passengers were still boarding and someone was holding the door" and she "never

22

informed Defendant Moctezuma that she took pictures of anything using her cellular phone." Pl's 56.1 Counter ¶ 104 (citing Fulford Tr. 149:20–150:1; 151:6–10).

Third, defendants allege that plaintiff "disregard[ed] . . . Dispatcher Moctezuma's attempts at reinstruction while walking out of his office mid-conversation, and his direction that she was being sent home." Defs' 56.1 ¶ 104. While plaintiff does not dispute that she walked out of Moctezuma's office mid-conversation, she cites testimony disputing that this occurred while Moctezuma was engaged in reinstruction. *See* Pl's 56.1 Counter ¶ 104. There is thus conflicting evidence about what happened during this interaction and exactly under what circumstances plaintiff left the conversation.

Fourth, defendants assert that plaintiff was terminated for "delay[ing] . . . a train from leaving the station, us[ing] . . . her phone to record the conductor who was instructed to replace her on that train, and yelling of profane language at the conductor." Defs' 56.1 ¶ 104. Plaintiff alleges that, in fact, she "inform[ed] Defendant Moctezuma that her train was late because passengers were still boarding and someone was holding the door," not because she delayed the train from leaving the station. Pl's 56.1 Counter ¶ 104 (citing Fulford Tr. 147:12–14). Plaintiff also alleges that she "never informed Defendant Moctezuma that she took pictures of anything using her cellular phone." Pl's 56.1 Counter ¶ 104 (citing Fulford Tr. 149:20–150:1, 151:6–10). Plaintiff does not, however, specifically dispute that she yelled profane language at the conductor who came to replace her. Pl's 56.1 Counter ¶ 104. Nevertheless, the Court finds that there are disputes of material fact as to major portions of the fourth purported rationale for plaintiff's termination.

Finally, defendants assert that plaintiff was terminated for "depart[ing] out of the superintendent's office while he was mid-sentence." Defs' 56.1 ¶ 104. Plaintiff "[d]ispute[s] as to how [she] left [Superintendent] McManamon's office." Pl's 56.1 Counter ¶ 104. She

23

alleges that "McManamon refused to take [her] complaint . . . regarding Moctezuma" and told plaintiff "that such behavior was uncharacteristic of . . . Moctezuma" and that McManamon "[doesn't] get involved in things like this." Pl's 56.1 Counter ¶ 104 (citing Massimi Dec. Ex. 10, Defendants' NYSDHR Position Statement 4, ECF No. 63-10; Massimi Dec. Ex. 4, McManamon Memo, ECF No. 63-4; Fulford Tr. 176:9–12).

Given the factual disputes based on conflicting evidence about all five of the purported bases for plaintiff's termination, the Court finds that a reasonable jury presented with the evidence could conclude that plaintiff's termination was not for the reasons cited by defendants and that those reasons were in fact pretextual. Moreover, weighing the conflicting evidence is likely to require credibility determinations reserved for the finder of fact rather than for summary judgment. Thus, these genuine disputes of material fact make summary judgment inappropriate.

Even if the employer's stated reasons for plaintiff's termination were all true—rather than pretextual—there remains a genuine issue of material fact as to whether discrimination was "still a motivating factor in the employment decision." *Bart*, 96 F.4th at 574. Plaintiff has plausibly alleged that Moctezuma made racist and sexist remarks to plaintiff, and the parties do not dispute for purposes of the instant motion that Moctezuma said to plaintiff "I am going to get you fired! I don't like you!" Defs' 56.1 ¶ 64; Pl's 56.1 Counter ¶ 64. The parties also do not dispute that the termination decision was made by individuals who reviewed the "G-2" document written by Moctezuma. Racism and/or sexism may have influenced how Moctezuma wrote the document on which the decisionmakers relied, in part, for their decisions regarding plaintiff. Defendants have thus failed to establish that a reasonable jury could not conclude that racism or sexism by Moctezuma was a motivating factor in the decision to terminate plaintiff, even if NYCTA

24

had other legitimate reasons as well. This is an independent reason why summary judgment is inappropriate.

II.    Title VII Claim for Retaliation on the basis of Protected Activity

Plaintiff's second cause of action alleges that defendant NYCTA engaged in retaliation under Title VII. Compl. ¶¶ 122–28. On a motion for summary judgment, retaliation claims under Title VII are evaluated under the burden-shifting framework described in *McDonnell Douglas*. *See Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 458 (E.D.N.Y. 2025). A plaintiff must initially establish a prima facie case of retaliation by showing that "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).

Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). When deciding a summary judgment motion as to a retaliation claim, in addition to considering alleged acts of retaliation on their own, courts must consider them in the aggregate, "as even minor acts of retaliation can be sufficiently substantial in gross to be actionable." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (*quoting Hicks*, 593 F.3d at 165).

If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the alleged materially adverse action.

25

*Carr*, 76 F.4th at 177–78. If it does so, the burden shifts back to the plaintiff, who must prove that the defendants' stated reason is pretextual. *Id.*

One important difference between Title VII discrimination claims and retaliation claims is that the mixed-motive framework does not apply to the latter. In the context of Title VII discrimination claims, a plaintiff need not prove that discrimination was a but-for cause of the adverse employment action, only that discrimination was "motivating factor." *Radwan*, 55 F.4th at 130. The same is not true for retaliation. For a Title VII retaliation claim, a plaintiff must show that the "the retaliation was a 'but-for' cause of the employer's adverse action." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023). "[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Bostock v. Clayton County*, 590 U.S. 644, 656 (noting that but-for causation "can be a sweeping standard" and that "[o]ften, events have multiple but-for causes"); *Banks*, 81 F.4th at 275.

### A.      Plaintiff's Prima Facie Case of Retaliation

An employee's complaint may qualify as protected activity, satisfying the first element of this test, "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated [Title VII]." *Gregory v. Daly*, 243 F.3d 687, 700–01 (2d Cir. 2001); *Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, 697 F. Supp. 3d 112, 124 (S.D.N.Y. 2023) ("[P]laintiff's complaints may qualify as protected activity even if the complained-of conduct is not independently unlawful.").

"An employee need not have explicitly used the word[] 'discrimination' to afford his complaints protected activity status." *Beaumont v. Cablevision Sys. Corp.*, No.

26

10-cv-03585, 2012 WL 1158802, at *6 (E.D.N.Y. Apr. 9, 2012) (quoting *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 521 (S.D.N.Y. 2010)); *see also Ramos v. City of New York*, No. 96-cv-03787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) ("[T]here are no magic words that must be used when complaining about a supervisor."); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). Nor does the complaint need to have been formal or in writing. *Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013).

Plaintiff easily satisfies the first three elements. With respect to the first and second element, plaintiff alleges that at least three events constitute protected activity. First, "[o]n March 14, 2023, [plaintiff] told [d]efendant Moctezuma that she wanted to make a complaint against him." Pl's 56.1 Counter ¶ 42. Subsequently, Moctezuma observed plaintiff writing a G-2 statement. Pl's 56.1 Counter ¶ 162. Second, "[plaintiff] requested to file a complaint [about Moctezuma] with NYCTA Superintendent Brian McManamon." Pl's 56.1 Counter ¶ 42; *see also* Pl's 56.1 Counter ¶¶ 56, 148. Plaintiff asserts that "McManamon refused to take [her] complaint." Pl's 56.1 Counter ¶ 154. Third, on April 11, 2023, plaintiff filed a complaint regarding her interactions with Moctezuma with the NYCTA Equal Employment Office. Defs' 56.1 ¶ 73; Pl's 56.1 Counter ¶ 73. The Court finds that these three events each constitute protected activity. To be sure, defendants argue that "[p]laintiff's discussion with . . . McManamon cannot constitute protected activity because the conduct [p]laintiff complained of was facially neutral." Mot. 27–28. Specifically, defendants do not dispute that plaintiff "explained to [McManamon] that Moctezuma was screaming at me, yelling at me, insulting me, verbally assault—insulting me, calling me dumb, loud, and [saying] I had an attitude," but defendants maintain that this complaint was "devoid of any conduct being taken with respect to [p]laintiff's race [or] gender . . .

and therefore cannot constitute protected activity." Mot. 28. The Court does not agree. Plaintiff's complaints to McManamon sufficed to put him on notice of the possibility that she was or felt she was being mistreated on the basis of protected characteristics. Moreover, it is unambiguous that the decisionmakers were aware of the first two examples of protected activity, and it is possible that they were aware of plaintiff's complaint to the NYCTA Equal Employment Office as well. *See* Massimi Dec. Ex. 4, McManamon March 15, 2023 Memo at 2, ECF No. 63-4 ("Fulford entered my office complaining that T/D Moctezuma began yelling at her."); Massimi Dec. Ex. 3, Moctezuma March 14, 2023 G-2 at 4, ECF No. 63-4 ("She then asked who can I report you to."); Defs' 56.1 ¶¶ 63–64; Pl's 56.1 Counter ¶¶ 63–64. This is sufficient to meet the first and second elements.

With respect to the third element, plaintiff's termination undoubtedly constitutes a "materially adverse" action, and other employment actions taken with respect to plaintiff, such as her restriction to platform duties, may as well.

Plaintiff has also provided evidence of the fourth element: that there was a causal connection between her complaints of discrimination and her termination. "A causal connection in retaliation claims can be shown . . . by showing that the protected activity was followed closely by discriminatory treatment.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Immediately following plaintiff's complaints against Moctezuma, Moctezuma provided a G-2 statement detailing his allegations against plaintiff. Plaintiff asserts that this complaint was made intentionally "in an effort to lay the pretextual ground work for her termination." Opp'n 30. Moreover, six days later, a NYCTA supervisor recommended that plaintiff be terminated. Massimi Dec. Ex. 6, Nierer March 20, 2023 Email at 2, ECF No. 63-6 ("My recommendation is TERMINATION." (capitalization in original)). This time frame of six days is well within

28

the range where a causal connection can be inferred. *See, e.g.*, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Zeng v. N.Y. City Hous. Auth.*, No. 22-cv-00138, 2023 WL 4553416, at *7 (2d. Cir. 2023) (summary order) (focusing on date that supervisor "first recommended [plaintiff]'s immediate termination").

In addition to the timing, plaintiff has also provided evidence that when she "arrived at the probationary unit, . . . Noteman informed [her] of these reasons she was there: that the [d]efendants were watching her, they remembered her, and they received her complaints about . . . Moctezuma." Pl's 56.1 Counter ¶ 89 (citing Fulford Tr. 291:7–13). A reasonable jury could interpret these statements by Noteman to be an explicit admission of retaliation.

In sum, because plaintiff has provided evidence of all four elements, plaintiff has demonstrated a prima facie case of retaliation.

### B.      Defendants' Purported Non-Discriminatory Reason for Plaintiff's Termination

The Court resolves the second stage of the *McDonnell Douglas* framework identically for plaintiff's retaliation claim as it did with respect to the plaintiff's discrimination claim. Plaintiff has presented a prima facie case of retaliation, but defendants nevertheless can point to evidence in the record that, if true and not pretextual, would constitute a nondiscriminatory reason for plaintiff's termination. Accordingly, the Court moves to the third stage of the inquiry.

### C.      Whether Retaliation was a But-For Cause of Plaintiff's Termination

At the third stage, plaintiff must show that retaliation was a "but-for" cause of her termination. *Banks*, 81 F.4th at 275. Plaintiff need not show that "retaliation was the only cause of [NYCTA]'s action, but only that the adverse action would not have occurred in the

29

absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. The Court finds that a reasonable jury could find that defendants had a retaliatory motive and that plaintiff would not have been terminated were it not for that retaliatory motive. As the Second Circuit notes, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id*. As discussed above, *supra* Section I.C, plaintiff has presented evidence that contradicts, at least in part, each of the defendants' proffered bases for plaintiff's termination. At trial, a reasonable juror could thus find that the employer's proffered legitimate, nonretaliatory reasons do not hold water and that plaintiff would not have been terminated were it not for a retaliatory motive. Accordingly, defendants' motion for summary judgment is denied as to the Title VII retaliation claim against NYCTA.

III.    Purported Title VII Claim for Hostile Work Environment

The parties have briefed a purported Title VII claim for hostile work environment, *see* Mot. 22–26; Opp'n 23–25, but it does not appear that there is such a claim in the case. Plaintiff did not include a Title VII hostile work environment claim among the thirteen counts in the complaint. *See* Compl. ¶¶ 118–88. The complaint mentions "hostile work environment" only a single time, stating that "[o]n March 14, 2023, [plaintiff] submitted a written complaint to the NYCTA Division of Stations, where she complained of discrimination, gender inequality, hostile work environment, harassment, intimidation, and disruptive behavior by Defendant Moctezuma." Compl. ¶ 70. The complaint's factual assertion that plaintiff submitted a written workplace complaint to a NYCTA office that

30

alleged a hostile work environment does not amount to pleading a Title VII claim for hostile work environment. Moreover, "where a plaintiff fails to properly allege a claim in his complaint, [s]he may not later assert that claim at the summary judgment stage." *Sheils v. Minogue,* No. 06-cv-00482, 2011 WL 210580, at *1 (N.D.N.Y. Jan. 21, 2011); *see also Thomas v. Egan,* 1 F. App'x. 52, 54 (2d Cir. 2001) (summary order) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.").

Accordingly, the Court orders plaintiff to show cause, by filing a letter of 750 words or fewer on or before March 9, 2026, why the purported hostile work environment claim should not be dismissed for failure to plead the claim in the complaint.

IV.    NYSHRL and NYCHRL Claims

In addition to Title VII, plaintiff raises claims for discrimination and retaliation under the NYCHRL and the NYSHRL. Under the NYCHRL, the complaint raises claims of discrimination and retaliation against all defendants, an aiding and abetting claim against the Individual Defendants; and a vicarious liability claim against NYCTA. Compl. ¶¶ 139–58. Under the NYSHRL, the complaint raises claims of sex and gender discrimination and retaliation against all defendants and an aiding and abetting claim against the Individual Defendants. Compl. ¶¶ 159–88. To the extent plaintiff intended to bring NYSHRL or NYCHRL claims related to her sexual orientation, the Court deems this theory abandoned for the same reason as with respect to her Title VII claim. *See supra* Section I.A.

A.    Claims of Retaliation and Discrimination against NYCTA

Because plaintiff's Title VII claims against NYCTA based on race and sex discrimination survive summary judgment, her claims under the NYCHRL and the NYSHRL premised on the same conduct against the same defendant automatically survive

31

summary judgment as well. *See Kwan*, 737 F.3d at 843 n.3 ("[T]o the extent that the defendant has failed to show it is entitled to summary judgment under *McDonnell Douglas*, it would not be entitled to summary judgment under the more expansive standard of the NYCHRL."); *Herrera v. Syracuse Univ.*, No. 24-cv-00245, 2025 WL 874734, at *15 (N.D.N.Y. Mar. 20, 2025) (explaining that "claims brought under NYSHRL have traditionally been analyzed identically to claims under Title VII," and since 2019 amendments, have been evaluated under an even more expansive standard "closer to the standard of the [NYCHRL]").[6]

### B.   Claims of Retaliation and Discrimination against the Individual Defendants

Both the NYCHRL and the NYSHRL make individuals liable for aiding or abetting prohibited conduct. *See* N.Y.C. Admin. Code § 8-107(6) (making it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter"); N.Y. Exec. Law § 296(6) (same). The Second Circuit has held that, under either law, an employee can be liable if they "actually participate[] in the conduct giving rise to" the NYSHRL or NYCHRL claim. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)

With respect to defendant Moctezuma, the Court finds that a reasonable jury could conclude that Moctezuma "actually participate[d]" in the conduct leading to the alleged discrimination and/or retaliation against plaintiff. *Feingold*, 366 F.3d at 157. Accordingly,

---

[6]   The Court also notes that the NYCHRL and the NYSHRL encompass a wider range of conduct than Title VII, so even had the Title VII claim not survived summary judgment, the NYCHRL and NYSHRL claims still might. *See Choudhury v. Northwell Health, Inc.*, No. 23-cv-01406, 2025 WL 2300220, at *5 (E.D.N.Y. Aug. 8, 2025) ("Under the NYCHRL, a plaintiff may establish discrimination by showing that he was treated less well, at least in part for a discriminatory reason." (quoting *Khwaja v. Jobs to Move Am.*, No. 19-cv-07070, 2021 WL 3911290, at *3 (S.D.N.Y. Sept. 1, 2021))).

defendant's motion for summary judgment on the NYCHRL and NYSHRL claims with respect to defendant Moctezuma is denied.

With respect to the other Individual Defendants—Young, Noteman, Jacob, and Khan—the Court finds that a reasonable jury could conclude that these individuals participated in the allegedly discriminatory and/or retaliatory action of terminating plaintiff's employment. Young instructed his subordinate, Noteman, to draft the termination memorandum, Noteman was the individual who in fact drafted the termination memorandum, and Khan and Jacob (as well as Young and Noteman) participated in the termination meeting where plaintiff's employment was terminated. Defs' 56.1 ¶¶ 100–01, 107; Pl's 56.1 Counter ¶¶ 100–01, 107. If plaintiff were to establish at trial that her termination was discriminatory and/or retaliatory, a reasonable jury could conclude that the remaining Individual Defendants "actually participate[d]" in conduct prohibited by the NYCHRL and NYSHRL. *Feingold*, 366 F.3d at 157. Accordingly, defendants' motion for summary judgment on the NYCHRL and NYSHRL claims with respect to defendants Young, Noteman, Jacob, and Khan is denied.

C.     Claims of NYCTA's Vicarious Liability for Individual Defendants' Alleged Violations of the NYCHRL

Plaintiff's seventh cause of action alleges that defendant NYCTA is liable for the discriminatory conduct of the individual defendants. Compl. ¶¶ 154–58. The NYCHRL makes employers vicariously liable for any "unlawful discriminatory practice based upon the conduct of an employee." NYCHRL § 8-107(13). Because a reasonable jury could conclude that one or more of defendant NYCTA's employees engaged in a discriminatory practice prohibited by the NYCHRL, defendant NYCTA itself may be vicariously liable for

33

the conduct of its employees. Accordingly, defendant's motion is denied insofar as it seeks summary judgment on plaintiff's vicarious liability claim.

V.    Remaining Claims

Plaintiff's remaining claims are Section 1983 against the Individual Defendants, negligence against all defendants, "respondeat superior" against NYCTA, and assault and battery against the Individual Defendants. Compl. ¶¶ 129–38; 174–88. Defendants are entitled to summary judgment on each. Plaintiff's opposition brief makes no attempt to oppose summary judgment with respect to her Section 1983 claim. *See* Opp'n. Meanwhile, plaintiff explicitly states that she "does not oppose the dismissal of her negligence claims." Opp'n 33. Plaintiff's complaint lists "respondeat superior" as an independent cause of action, but "[i]t is well-established . . . that respondeat superior is not a cause of action at all, but a theory of liability that must attach to a separate claim." *Lederman v. Benepe*, No. 12-cv-06028, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (emphasis omitted) (quoting *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)). Finally, with respect to plaintiff's claim for assault and battery against the Individual Defendants, plaintiff concedes that none of the Individual Defendants assaulted or battered her, and maintains only that "her assault by a NYCTA passenger during the course of her employment is part of her harassment and discrimination claims since the [d]efendants intentionally placed her at that location as retaliation for her complaints of discrimination, and she was thereafter sexually assaulted." Opp'n 33. Evidence concerning plaintiff's sexual assault, defendants' choice to station plaintiff in the location where she was assaulted, and defendants' treatment of plaintiff in the aftermath of her assault may be relevant to her claims regarding employment discrimination. But plaintiff's opposition makes no meaningful attempt to argue that plaintiff has satisfied the

34

elements of a claim for assault and battery against the named defendants. Accordingly, defendants' motion is granted with respect to these claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED** with respect to plaintiff's claims for violation of Section 1983, negligence, "respondeat superior," and assault and battery, as well as with respect to plaintiff's Title VII discrimination, NYSHRL discrimination, and NYCHRL discrimination claims insofar as these claims rest on a theory of discrimination on the basis of sexual orientation. Defendants' motion for summary judgment is **DENIED** with respect to plaintiff's claims for Title VII discrimination, NYSHRL discrimination, and NYCHRL discrimination insofar as these claims rest on a theory of discrimination on the basis of race or sex, as well as plaintiff's claims of retaliation under Title VII, NYSHRL, and NYCHRL.

On or before March 9, 2026, plaintiff shall file a letter of 750 words or fewer stating why the purported hostile work environment claim should not be dismissed for failure to plead the claim in the complaint.

In accordance with the Court's Individual Practice Rule IV.A, the parties shall file a proposed joint pretrial order by April 1, 2026.

**SO ORDERED.**

  _/s/ Natasha C. Merle_
NATASHA C. MERLE
United States District Judge

Dated:        March 2, 2026
              Brooklyn, New York

35